LUTHER O. THOMAS and JAMES CANAZZA, complainants,

*v.*

EGG HARBOR BREWERY, defendant, and JOHN M. ZERBEY and CHARLES B. ROELLER, petitioners, and LUTHER O. THOMAS, defendant.

[Decided May 1st, 1935.]

*Mr. William H. Smathers,* for the complainants.

*Mr. Emerson Richards,* for the petitioners.

SOOY, V. C.

On July 17th, 1934, this court confirmed a sale of property known as the Egg Harbor Brewery and on February 21st, 1935, Luther O. Thomas, the receiver of the Egg Harbor Brewery, filed a petition against the purchasers of the brewery, seeking to compel them to comply with the terms and conditions of the sale so as aforesaid confirmed and, upon the failure of said purchasers to comply with the terms and conditions of sale, that the order of confirmation be vacated and declared null and void.

On March 5th, 1935, the purchasers, John M. Zerbey and Charles B. Roeller, filed a petition in this court against the receiver, praying that they be relieved from any obligation or liability under the order of confirmation aforesaid, that said order be revoked and canceled, that there be returned to them the sum of $5,000 paid to the receiver on account of said order, as well as other moneys advanced by them in connection with the deal.

The argument on the return of the order to show cause advised under each of said petitions was so arranged that the entire matter was argued at the same time and the court, not being satisfied with the proofs as contained in the affidavits, set the matter down for hearing on oral proofs in open court and at the hearing testimony was adduced in behalf of both sets of petitioners.

The filing of the two petitions was discussed with the court by counsel for both sets of petitioners at about the same time, so that the inference that might be drawn from the fact that the Zerbey and Roeller petition was filed after the Thomas petition and was, therefore, an after-thought, is not warranted.

Taking up the petition of Zerbey and Roeller, we find that they allege that they submitted a proposition of purchase on

or about July 2d, 1934, and that they were induced so to do by representations that had been theretofore made to them by Thomas, the receiver, and that those representations were untrue; that they relied on them to their detriment and, therefore, have a right to rescind and, in fact, have advised the receiver that they have rescinded, with the result that the receiver is now in possession of the brewery property in its entirety.

The alleged false representations were made by Thomas, according to the petition, prior to July 17th, 1934, and were, generally, as follows:

(a) Thomas represented that there were one thousand five hundred barrels of good marketable beer upon the premises;

(b) That there were approximately nine hundred barrels (empties) on the premises belonging to the brewery;

(c) That there were on hand six hundred cases of beer bottle containers and that the receiver had purchased one thousand eight hundred new cases;

(d) That there were a large number of new bottles on hand;

(e) That the real estate of the brewery was in good condition, with the exception of very minor necessary repairs;

(f) That the plant was a going concern, capable of manufacturing a satisfactory commercial quality of beer;

(g) That the permits of the federal government and the state government could be transferred without additional expense to the petitioners.

Petitioners having set forth, as aforesaid, the alleged misrepresentations on the part of the receiver, say in paragraph 7 of their petition:

"Later on the same day or the following day [reference is to July 17th or 18th] petitioners began to find that the representations made to them were untrue and later they discovered that there were only two hundred barrels of marketable beer; that there were only a small number of barrels instead of the number represented, and a small number of cases; that the new bottles were not beer bottles and not suitable for the purpose; that the licenses or permits could not be trans-

fered and that new permits would have to be obtained at a largely increased expense; and that the brewery was in a very dirty condition and that vital parts of the beer-making section of the building was infected so that it was impossible to manufacture beer; that the machinery was worn out and that an inventory of the personal property which had been previously shown to the petitioners was inaccurate and untruthful. On either July 17th or 18th, 1934, petitioners discovered that the receiver had diverted a large quantity of beer without having accounted to the state and federal authorities therefor; that this shortage amounted to approximately seven hundred barrels and that in order to conceal a part of such shortage water had been pumped into the storage vats to the amount of four hundred barrels. That this condition * * * resulted in the refusal of the state and federal authorities to grant a permit and as a consequence petitioners were compelled to operate the brewery as the agents of the receiver and to keep his employes in charge of the property although in their opinion such employes should not have been retained as they were concerned in the beer shortage."

Taking the allegations of the petitioners as above set forth, we find that substantially all of the alleged misrepresentations relied upon by the petitioners, Zerbey and Roeller, were known to them within two days after they went into possession of the brewery and became bound by the terms of sale, yet we find, as stated in the petition, that they did not attempt to rescind the contract of sale prior to the last of January, 1935, when they say they rescinded the contract and demanded a return of the moneys theretofore advanced by them.

Not confining Zerbey and Roeller to the strict language of the petition, the evidence justifies the conclusion that these petitioners were in full possession of the knowledge of all the alleged misrepresentations long prior to October 1st, 1934.

Zerbey and Roeller say that they continued in an attempt to perform their contract between July 17th, 1934, and the last of January, 1935, by reason of promises on the part of the receiver and of his representations that adjustments would

be made that would be satisfactory to Zerbey and Roeller, and the receiver and his counsel, Judge Smathers, deny that Zerbey and Roeller ever complained of any alleged misrepresentations up until the time they attempted to evade their responsibility under the contract in January of 1935. The receiver admits, however, that the question of deposits made by customers on account of cases, bottles or goods was discussed between Zerbey and Roeller and the receiver and that Zerbey and Roeller attempted to procure an adjustment of this feature but that the receiver advised them that there would be no adjustment. The correspondence shows that the question of the deposit adjustment started sometime in the early part of August, 1934, and that the receiver very shortly thereafter refused to make any adjustment.

On the question as to whether or not Zerbey and Roeller continued in the premises for the period above related by reason of promises on the part of the receiver, as above set forth, in addition to the denials of the receiver and his counsel that there were any such promises, Zerbey and Roeller admit that they never, in writing, made any reference to the alleged misrepresentations of the receiver.

Zerbey and Roeller also say that the promises of the receiver were verified by promises of one Lewis P. Scott, who represented, through his association with Judge Smathers, the receiver, and that Scott repeatedly promised that adjustments would be made of the matters the subject of the alleged misrepresentations. Mr. Scott says that Zerbey and Roeller never discussed with him any alleged misrepresentations, so that I have on this important question, Zerbey and Roeller as against the receiver, Judge Smathers and Mr. Scott, and in addition to this, I must take into consideration whether or not it is reasonable to assume that Zerbey and Roeller, notwithstanding the seriousness of the alleged misrepresentations, would have continued to operate the brewery for the period of time above indicated without a "show down" long prior to the last of January, 1935, and without ever making any written complaint.

As to the reasonableness of the assertion of Zerbey and

Roeller, we find that they say there was a representation of two thousand five hundred barrels of good marketable beer. This represented, in cash, upon the sale of the beer, more than the entire deposit paid by Zerbey and Roeller on account of the purchase price and the shortage was immediately discovered and, according to the evidence of Zerbey and Roeller, there were only approximately six hundred barrels of fairly good marketable beer left for them to operate with.

Again, according to the testimony of Zerbey and Roeller, it was very shortly discovered that none of the wooden vats were in good enough shape to properly store beer and yet with that condition they continued to operate to the extent that they marketed over $30,000 worth of their product.

Both Zerbey and Roeller say that the item of beer bottles, beer containers, &c., were more or less of a minor consideration and it may well be that they would have continued under a promise with respect to that item.

With respect to the alleged representation that the licenses to operate would be transferred without expense to Zerbey and Roeller, and testimony discloses that if any such representation was relied upon it was immediately discovered that such a result could not obtain, with the result that Zerbey and Roeller made application for their own permits.

With respect to the attempt to show as a reason for the non-granting of the government license which Zerbey and Roeller say was withheld because of the watered beer, it is sufficient to point out that there is no evidence in the case that would substantiate any such finding but that on the contrary, the evidence, as disclosed by the letters from Pennington, the United States agent, indicate that the reason for the non-granting of the permit was delay on the part of Zerbey and Roeller in filing the proper papers with the government.

All of these things, together with many others, cast great suspicion on the allegation of Zerbey and Roeller that they continued in possession by virtue of promises on the part of Thomas and his representatives, as alleged by them, and I find the fact to be that there were no such promises and that

Zerbey and Roeller continued in possession because they considered that they had purchased the brewery at a bargain and accepted conditions as they found them.

In this finding of fact I do not hold that Thomas did not advise Zerbey and Roeller that the contents of the vats, according to government figures, was approximately two thousand five hundred barrels. He says he so advised them and they both, in their testimony, say that Thomas approximated the quantity of beer, and I think that Thomas believed the beer, other than that which he advised was not good, was of marketable quality, but that Zerbey and Roeller were not relying on any representation of Thomas as to the quantity and quality of the beer is evidenced by their immediate inspection, by an expert, and his finding as to shortage of quantity and inferiority as to quality, and with this knowledge they continued to perform their contract.

There is no doubt but that the failure of the government to dump the vats containing watered beer inconvenienced Zerbey and Roeller but there is absolutely no proof that the receiver was in any way responsible for the delay and Zerbey and Roeller put up with the inconvenience until it was finally dumped in December, and I might add that there is no proof that the receiver knew of the watered beer until it was discovered by Zerbey and Roeller. Of course, the question as to whether Will, the brewmaster under the receiver, said that Thomas knew about it is not proof of the fact and was only offered for the purpose of contradicting Will.

Before adverting to the legal situation, based upon the allegation of the petition, as heretofore set forth, there is one other finding of fact that seems to be necessary.

Zerbey and Roeller say that they were never given possession of the brewery by Thomas but that they took over the management of the brewery as agents for Thomas. Thomas says that full possession was given to Zerbey and Roeller and that he, Thomas, believing that Zerbey and Roeller would get their operating permits within a week or ten days, consented that they should operate under his permits. All of the circumstances indicate that Zerbey and Roeller went into actual

possession of the brewery and operated it as their own or as the property of the new corporation, from the 18th day of July, 1934, until the latter part of January, 1935. They collected all the moneys that were earned from the sale of the product and actually marketed some $30,000 worth of their product, they hired and discharged employes, they made their own malt contracts, contracted for cooperage, bought a truck, opened up a separate bank account and assumed complete control, and I find as a fact that they were not operating the brewery as agents for Thomas.

I cannot condone the mistake made by Thomas in permitting the above condition of affairs to happen. He should not have turned over possession and permitted the operation of the brewery under his permits, but this indiscretion on his part does not justify me in finding that Zerbey and Roeller acted as agents for the receiver, nor does the fact that Thomas signed the reports to the liquor control boards justify a finding that Zerbey and Roeller were his agents. The reports were made out at the brewery, based on data from the books of the brewery company, and brought to Atlantic City for Thomas to sign, and in so doing he was merely assisting Zerbey and Roeller in the operation of the brewery which they had taken over and for which they were endeavoring to get permits to operate.

Under the factual situation as heretofore outlined, if Zerbey and Roeller were induced to enter into the contract in question by the alleged fraudulent misrepresentations on the part of the receiver, it was unquestionably their duty to either rescind the contract by reason of the fraud or, by continuing in a performance thereof, they will be held to have ratified it, unless they have been again misled by the receiver or his representatives in a continuation under the contract by promises of adjustments, &c. I have already found as a fact that Zerbey and Roeller were not induced to continue in the performance of the contract by representations on the part of the receiver or his representatives of an adjustment of the alleged false representations and it necessarily follows that there was a continued attempt at performance by Zerbey and

Roeller from the 18th day of July, 1934, until the latter part of January, 1935, during practically all of which time Zerbey and Roeller were fully aware of the alleged false representations, and did nothing looking toward a rescission until a petition in bankruptcy was filed against their new brewery company when they notified the receiver that they rescinded, demanded their deposit back, plus other moneys, by way of damages.

In *Dennis* v. *Jones, 44 N. J. Eq. 513,* the court held:

"1. The defrauded party to a contract has but one election to rescind, which he must exercise with reasonable promptitude after the discovery of the fraud and when he once elects he must abide by his decision.

"2. Delay in the rescission of the contract, payments in pursuance of it, and continued dealing with it and with reference to the fraudulent transaction, after discovery of the fraud, may be shown as evidence of an election to treat a fraudulent contract as valid.

"3. Where, after knowledge of fraud in the sale of a skating rink, the purchasers, without complaint of the fraud which had been practiced upon them, paid portions of the purchase money and repeatedly promised to pay the remainder of it, dealt with the rink as their property, made changes in it and in the method of conducting its business, advertised it for sale, and negotiated for the disposition of it, they were held to have elected to abide by their contract."

It is significant that during the latter part of the period during which Zerbey and Roeller were attempting performance of their contract they endeavored to sell their interest in the plant and they endeavored to raise further moneys by way of a loan for the operation of the plant.

The case of *Faulkner* v. *Wassmer, 77 N. J. Eq. 537,* sets forth in full the legal principles under which relief must be refused to Zerbey and Roeller, and further citations are unnecessary.

The result is that Zerbey and Roeller having, as alleged in their petition, rescinded their contract, find themselves without right to relief, and the receiver finds himself again in

possession of the brewery property abandoned by Zerbey and Roeller, and this court has given the mortgagee permission to foreclose the mortgage against the brewery property.

Zerbey and Roeller are not entitled to the equity which the prayer of the receiver's petition accords them, *i. e.,* a right at this late date and after rescission, to complete the terms of their purchase. On the other hand, if within ten days from the filing of this opinion, they, in writing addressed to the receiver, signify their desire so to do, the court will entertain their proposition so submitted, otherwise the receiver will be directed to offer the property for an immediate resale.